The defendant was found guilty of evading responsibility (General Statutes § 14-224) and breach of the peace (§ 53-174) and has appealed from the judgment rendered. The only question for determination is whether the evidence supports the court's conclusion that the defendant was guilty of the crimes charged beyond a reasonable doubt.
There was evidence from which the court could reasonably have found the following facts. On December 23, 1960, between 1:15 and 1:30 a.m., the complainant, a nineteen-year-old girl, left the car parking lot of the Villa Rose restaurant in Windsor Locks for home in her Austin-Healey-Sprite automobile. She was alone, and soon after leaving she noticed that a car with dual headlights was following her. When she had crossed the Enfield town line, at about 1:45 a.m., the trailing vehicle drew up closer and blinked its headlights. Thinking it might be a police officer or someone she knew, the complainant stopped her car. The other car also stopped and a man got out and came to her car, and she rolled down the window of the door on the driver's side. Bending down, the man asked her if she knew she had gone through a "stop light." She replied she had gone through a flashing red traffic light, but not a stop light. He then inquired where she was going, and when she said home, he asked her where that was. When she told him Enfield, he asked what she was doing with Massachusetts registration plates on her car. She replied that he had better look again, because they were Connecticut plates. He said, "Why don't you come out and look?" During this conversation, the girl was trying to raise the door window but could not do so as the man was holding it down with his gloved hands. Still attempting to raise the window, *Page 362 
the girl refused to get out of her car and said she was going home; he replied he did not think she was. She told him she did not think he was a police officer and it was not any of his business where she was going. When he said in what she described as a threatening voice, "I don't think you are going home," she became frightened and drove off. The man returned to his car and followed her, this time very closely, with his headlights on the high beam.
While the cars were proceeding on route 5 in Enfield, the trailing car ran into the rear of the complainant's car. She was afraid to stop and continued on, with the other car still following. She drove to the police station in Thompsonville, and when she stopped there, the other car continued on, and as it went by she saw it was a blue Ford station wagon. She went inside the police station and reported the episodes described above. Although she could not see the man distinctly, she told the police she had a good look at his profile and noted he had a large nose and wore a soft hat and whitish gloves. When she reported she recognized the car as a blue Ford station wagon, one of the policemen said he knew of such a car in town. The police took the girl over her route from the restaurant to the station, and she pointed out the section where she had stopped and also the place on route 5 where the collision had occurred. At the latter place, they found broken pieces of glass which were identified as having come from the Sprite's smashed right rear taillight. Thereupon, the police took the girl to the yard of a rooming house on Main Street in Thompsonville, where they showed her a 1959 blue Ford station wagon. She identified the car as being very similar to the one that went by her when she stopped at the police station. Returning to the police station, an officer was dispatched to the rooming house to check over the blue Ford station wagon. While the officer *Page 363 
was examining the car, the defendant came out of the house with his roommate. The defendant explained that he had observed someone at his car, and he inquired of the officer what the trouble was. The officer told him of the girl's complaint, and defendant denied that he was involved. Both men, when they came out of the house, wore trousers. The roommate wore a shirt, but the officer could not remember if the defendant also wore a shirt. The men explained they were drinking some beer before going to bed. When the officer asked the defendant at about 3:00 a.m. to come to the police station, he complied readily. Going to the police station, the defendant wore a car coat, a felt hat and white gloves. When the defendant entered the station, the police asked the complainant to observe and listen to him as they questioned him in an adjoining room. After observing the defendant and hearing him talk, the girl identified him as the man who stopped her on the highway. She also identified the white gloves he wore in the station not only by their color but also by their large size and a belt on the back of each glove. She described the hat he wore in the station as the same style as the one worn by the offender.
The complainant's car showed the following damage attributed to the accident. The lens of the right rear taillight was smashed. There were rear body dents and scratches on the two rear bumperettes, and a little blue paint was found on the right rear bumperette. The defendant's blue-colored station wagon had two fresh marks or scratches on it. The scratches on the front bumper of the station wagon coincided in spacing and height with the scratches on the bumperettes of the complainant's car.
Defendant conceded in his brief and in argument that the state had proven beyond a reasonable doubt that the crimes of evading responsibility and breach of peace had been committed, but he denied he was *Page 364 
the offender. He also insists that the complainant was mistaken in identifying him as the offender, explaining that at the time of the commission of the offenses he was in a Suffield restaurant. He testified that he quit work at 12:30 a.m. on December 23 and stopped at the Villa Rose about 12:40 a.m. Remaining there until about one o'clock, he and a companion left for a restaurant in Suffield, each driving his own car. They arrived at the Suffield restaurant at about 1:25 a.m. and remained there about half an hour. This version was corroborated by his companion. The restaurant in question has liquor privileges and is located in the center of Suffield, just off Main Street and a very short distance from the police station. In further support of his alibi, the defendant produced three coworkers who claimed they were in the same restaurant between one and two o'clock and that the defendant and his companion came in about 1:15 a.m. and remained for half an hour.
Defendant claims that his identification by the complaining witness was highly questionable because she had only a glimpse or two of the man's profile as he stood beside her car in a dimly lit area, and that it is unreasonable to believe that under those circumstances she could properly identify the offender. He protests that he was not picked from a police line-up but instead was pointed out to the complainant as the owner of the blue Ford station wagon which she had looked at a short while before in the yard of the rooming house. He contended, too, that the slight damage to the front of his vehicle was caused several months before in Manchester, when an unidentified car ran into it while it was parked.
Whenever the defense of alibi "is so far proved that upon the whole evidence a reasonable doubt as to the guilt of the defendant is caused, he is entitled *Page 365 
to an acquittal." State v. Bill, 146 Conn. 693, 697. In the present case, the trial court concluded there was no merit to the alibi. It was no doubt aided to that conclusion by the testimony of the owner of the Suffield restaurant and a Suffield policeman. The former testified his restaurant was closed at and after 1 a.m. and that the defendant and his alibi witnesses were not in his premises that morning. The policeman, who had passed by the restaurant several times after midnight, said the restaurant appeared to him to be closed at one o'clock and thereafter.
While there is merit to defendant's complaint about the manner in which his identification was made, it appears the identification was made at about 4 a.m., at which time it would no doubt be very difficult to arrange a police line-up to guard against the chance of a mistaken identification. However, the testimony of the complainant emphasizes that the basis of her identification of the defendant was not so much that she remembered his face but that she unequivocally identified his voice as being the same voice she heard in the above reported conversation a little more than two hours before, when she stopped on the highway.
It has been repeatedly held that "the power to accord or deny credibility to a witness is an exclusive function of the trier." Armstrong v. Watrous,138 Conn. 127, 129. The court heard the witnesses, observed their demeanor on the witness stand and had the opportunity to assess and weigh their powers of observation under direct and cross examination. The conclusion of the court indicates that it accorded complete credibility to the complainant and her identification of the defendant and that it rejected the proffered alibi. We cannot accept, upon the conflicting evidence presented at the trial, the defendant's version of the facts. To do *Page 366 
this would amount to our retrying the case on the evidence, which, of course, we cannot do. The determination of the controversial issues of fact was solely within the province of the trial court. State
v. Coulombe, 143 Conn. 604, 609. There is ample evidence to sustain the conclusion of the court that the defendant is guilty of the offenses charged beyond a reasonable doubt.
 There is no error.
In this opinion CIANO and DALY, Js., concurred.